UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:14-cv-8-FDW

| | |
|---|---|
| WILLIAM C. KLINGER, | ) |
| Petitioner, | ) |
| vs. | ) |
| | ) **ORDER** |
| CARLTON B. JOYNER, | ) |
| Respondent. | ) |

**THIS MATTER** comes before the Court on Respondent's Motion for Summary Judgment, (Doc. No. 4), as to Petitioner's habeas petition brought pursuant to 28 U.S.C. § 2254.

## I.   BACKGROUND

Pro Petitioner William C. Klinger is a prisoner of the State of North Carolina, who, on January 23, 2012, in Avery County Superior Court, was convicted after trial by jury of seven counts of statutory sex offense, three counts of taking indecent liberties with a minor, and one count of delivering a controlled substance to a minor, and was sentenced to two consecutive terms of 259-320, five consecutive terms of 248-307, one consecutive term of 17-21, and one concurrent term of 66-89 months imprisonment, in cases 10 CRS 432-34, 50169 and 11 CRS 1745.  (Doc. No. 5-4).  On March 19, 2013, the North Carolina Court of Appeals issued an unpublished opinion finding no reversible error on the statutory sex offenses and indecent liberties charges, but vacating the conviction for delivery of a controlled substance.  State v. Klinger, 739 S.E.2d 627 (N.C. Ct. App. 2013).  On June 12, 2013, the Supreme Court of North Carolina denied Petitioner's petition for discretionary review.  (Doc. No. 5-3).  Petitioner was

represented at trial by Kent W. Brown and on appeal by Russell J. Hollers, III.

Petitioner placed his pro se federal habeas petition in the prison system for mailing on December 30, 2013, and it was stamp-filed in this Court on January 14, 2014. Petitioner contends: (1) he was denied due process of law under the Fourteenth Amendment when the prosecutor made improper arguments to the jury, including calling Petitioner a "child predator" and a "wolf in sheep's clothing"; and (2) he was denied due process under the Fourteenth Amendment when the trial court admitted evidence of his religious beliefs—specifically, that Petitioner practiced Satanism.

On February 18, 2014, Respondent filed the pending motion for summary judgment. (Doc. No. 4). On February 21, 2014, this Court entered an Order pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), granting Petitioner fourteen days to respond to the summary judgment motion. (Doc. No. 7). Petitioner did not respond to the summary judgment motion.[1]

The North Carolina Court of Appeals summarized the facts from Petitioner's trial as follows:

> The State presented evidence at trial tending to establish the following facts: In the summer of 2009, "Randy" was 13 years old, living at home with his parents in Banner Elk, North Carolina. Defendant, who was in his early forties at the time, was introduced to Randy, and they became friends.
>
> On the first occasion in which they spent time together, defendant picked up Randy and took him to his house near Valle Crucis, where they sat on the back porch and smoked marijuana together. After this incident, defendant and Randy began meeting two to three times a week to smoke marijuana at defendant's house. Fearing his parents' disapproval, Randy told his parents that he was

---

[1] Petitioner submitted a letter to this Court on around March 5, 2014, seeking assistance and direction from the Court as to how to respond to the summary judgment. To the extent that Petitioner was seeking appointment of counsel in his letter, his request for counsel is denied.

spending time with a friend his own age.

Defendant and Randy subsequently planned to take a trip together. Seeking to invent a false story that would result in his parents allowing him to travel with defendant, Randy told his parents about a fictitious friend's stepfather who worked as a reporter for a television station. Randy then asked if he could go with the friend's stepfather to help film the Highland Games. However, Randy's parents insisted on meeting the friend's stepfather before allowing Randy to go on the trip. When they met defendant, he wore a wedding ring and told them that he was married and had a stepson who also would be going on the trip. When Randy's parents asked to meet defendant's wife and stepson, the trip was cancelled.

Randy's parents did, however, allow him to go on day trips with defendant. The first trip was in October 2009, when defendant and Randy went to Beech Mountain to film "Oz Fest." After filming the music festival, they drove to Boone where defendant stopped and rented a room at Greens Motel. Once they got into the motel room, defendant and Randy smoked marijuana and snorted crushed up pills. At that point, defendant forced Randy to perform oral sex on him. Defendant then performed oral sex on Randy. Defendant threatened to tell Randy's parents that Randy had impregnated his girlfriend if he did not do as he was told. Upon returning home, Randy did not tell his parents what had happened because he was scared defendant would hurt him.

Randy went out with defendant the next weekend on the pretense of filming the Blue Ridge Parkway. Before doing any filming, defendant drove Randy to the Pineola Inn and rented a room. Defendant and Randy then smoked marijuana and drove up to the parkway. After doing some filming, they drove back to the motel, where they smoked more marijuana and snorted crushed pills. Defendant then pushed Randy onto the bed and threatened to tell his parents if Randy did not have sex with him. Defendant forced Randy to get on the floor and perform oral sex on him while he was sitting on the edge of the bed. He then had Randy lie down on the bed while defendant performed oral sex on him. Defendant then rolled over onto his side and made Randy engage in anal sex with him. Afterward, the two of them smoked more marijuana, ate dinner, and went home. When defendant dropped off Randy at his parents' house, they could tell that Randy was "high" and told him that he could not see defendant anymore.

Approximately one week later, Randy snuck out of his window around midnight and met defendant at the end of the driveway. They drove around for approximately three hours smoking marijuana. After this incident, Randy began sneaking out almost every night to meet up with defendant and take drugs.

On two occasions, defendant engaged in sexual activity with Randy in his

vehicle. Each time, defendant pulled down his pants and told Randy to perform oral sex on him, which Randy proceeded to do. Defendant then instructed Randy to pull down his pants, and, once Randy did so, defendant performed oral sex on him.

Defendant also engaged in sexual activity with Randy at defendant's house. Defendant had Randy perform oral sex on him in his bedroom on at least three separate occasions, and defendant performed oral sex on Randy once or twice. On one occasion, defendant had Randy lie down on the bed, take his clothes off, and have anal sex with defendant. While at defendant's house, they would smoke marijuana and take pills, and on one occasion they drank liquor.

On 31 December 2009, Randy snuck out of the house and went with defendant to a friend's house to watch television and smoke marijuana. Before Randy got back home, his parents went to check on him and discovered that he was not in bed. Randy's father called Randy's cell phone and told Randy that if he was not home in 10 minutes he was calling the police. When Randy got home, he refused to tell his parents who he had been out with that night. Following this incident, Randy's mother found a picture of Randy, along with satanic symbols, on defendant's Facebook page. Randy's parents subsequently obtained a restraining order prohibiting defendant from having any further contact with Randy.

Despite the restraining order, defendant and Randy communicated regularly through email and text messaging. Defendant would put marijuana and pills in prescription bottles and drop them off near Randy's house. Randy would then ride his bike to the prearranged location, obtain the drugs, and return home.

On 14 February 2010, Randy's mother found pills near his computer and confronted him about them the next day. Randy refused to tell her how he had obtained them. He became angry and punched several holes in the wall, hit his mother with a telephone, and threatened her. That afternoon, Randy's mother contacted John Troy Autry ("Autry"), a juvenile court counselor, who filed a juvenile petition charging Randy with assault and injury to property.

On 1 March 2010, the district court held a hearing on the petition and adjudicated Randy delinquent on both counts and placed him on probation for 12 months. As conditions of probation, Randy was required to give up his cell phone and computer, submit to random drug tests, and allow his room to be searched. Prior to searching his room later on the day of the hearing, Autry asked Randy whether he had any items that he was not allowed to possess while on probation. Randy gave Autry at least 20 prescription bottles with the labels removed. When asked by Autry about defendant, Randy denied that defendant had given him the drugs or that he had approached him sexually.

4

In early March 2010, defendant, who had traveled to Florida because he was concerned that he was being watched, arranged to have some drugs delivered to Randy through friends. On 12 March 2010, Randy received from defendant 14 pills hidden in a Game Box console. That night, Randy and his girlfriend snorted two crushed up pills before going to a movie. When Randy got home that night, he took two more pills and went to sleep.

After Randy's father found him nonresponsive the next morning, Randy was taken to the hospital, where he was admitted for post intentional overdose of opiate medication, requiring intubation. He spent at least 10 days in the pediatric intensive care unit and was subsequently moved to a psychiatric facility. Randy was then moved to a residential treatment facility in Tennessee. While he was there, Randy was interviewed by Autry and Detective Frank Catalano with the Avery County Sheriff's Office. He told them that defendant had provided him with drugs, including the pills on which he had overdosed. He also explained that defendant had fondled his genitals, kissed his penis, and put his tongue on it. In a follow up interview, Randy described other sexual acts involving defendant.

Defendant was arrested and charged with, among other things, seven counts of statutory sexual offense, three counts of indecent liberties with a child, and one count of delivering a controlled substance (Oxycodone) to a minor. Defendant pled not guilty, and the case proceeded to trial, where defendant neither testified nor presented any evidence.

The jury convicted defendant of all the charges submitted, and the trial court imposed presumptive range sentences on each count. For two of the statutory sex offense counts, the court sentenced defendant to a minimum of 259 months and a maximum of 320 months imprisonment. For each of the remaining five statutory sex offense counts, the court sentenced defendant to 248 to 307 months imprisonment. For the indecent liberties charges, the court sentenced defendant to 17 to 21 months imprisonment for each count. The court ordered that the terms of imprisonment for the sex related offenses run consecutively. With regard to the charge of delivery of a controlled substance to a minor, the court sentenced defendant to 66 to 89 months imprisonment, running concurrently with the other charges.

State v. Klinger, 739 S.E.2d 627 (N.C. Ct. App. 2013) (unpublished) (footnotes omitted).

## II. STANDARD OF REVIEW

### A. Summary Judgment Standard

Summary judgment is appropriate in those cases where there is no genuine dispute as to

any material fact, and it appears that the moving party is entitled to judgment as a matter of law. FED. CIV. P. 56(c)(2); United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991). Any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). Where, however, the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

**B. Section 2254 Standard**

In addition to the motion for summary judgment standard set forth above, this Court must also consider the Petition for Writ of Habeas Corpus under the requirements set forth in 28 U.S.C. § 2254. Section 2254(d) provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> 
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> 
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also Tice v. Johnson, 647 F.3d 87, 103 (4th Cir. 2011).

A claim is considered "adjudicated on the merits" when it is "substantively reviewed and

finally determined as evidenced by the state court's issuance of a formal judgment or decree." Young v. Catoe, 205 F.3d 750, 755 (4th Cir. 2000) (quoting Thomas v. Davis, 192 F.3d 445, 455 (4th Cir. 1999)). A state court adjudication is "contrary to" clearly established federal law only if "the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the United States Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "It is not enough for us to say that, confronted with the same facts, we would have applied the law differently; we can accord [the petitioner] a remedy only by concluding that the state court's application of the law in his case was objectively unreasonable." See Tice, 647 F.3d at 103 (citing Williams v. Ozmint, 494 F.3d 478, 483-84 (4th Cir. 2007)). "[W]e will not discern an unreasonable application of federal law unless 'the state court's decision lies well outside the boundaries of permissible differences of opinion.'" Id. at 108 (quoting Goodman v. Bertrand, 467 F.3d 1022, 1028 (7th Cir. 2006)).

In addition, "[a] federal habeas court will not review a claim rejected by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Walker v. Martin, 131 S.Ct. 1120, 1127 (2011) (internal quotations and citations omitted). "The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits." Id. (citation omitted). A procedural default also occurs "when a habeas petitioner fails to exhaust available state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." Hyman v. Keller, No. 10-6652, 2011 WL 3489092, at *9 (4th Cir. July 21, 2011)

7

(quoting Breard v. Pruett, 134 F.3d 615, 619 (4th Cir. 1998)); see also 28 U.S.C. § 2254(b)(1)(A).

Section 2254's exhaustion requirement demands that a petitioner give "the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." Larry v. Branker, 552 F.3d 356, 366 (4th Cir. 2009) (quoting O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999)). However, a petitioner may overcome a finding of procedural default by showing cause and prejudice arising from the asserted constitutional error. McCarver v. Lee, 221 F.3d 583, 591-92 (4th Cir. 2000). To show "cause," a petitioner may make "a showing that the factual or legal basis for the claim was not reasonably available to counsel." Id. at 591 (quoting McCleskey v. Zant, 499 U.S. 467, 494 (1991)). To establish "prejudice," a petitioner must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Id. at 592 (quoting United States v. Frady, 456 U.S. 152, 170 (1982)).

A habeas petitioner may also overcome his procedural default by demonstrating that the court's failure to consider the claim will result in a fundamental miscarriage of justice. Hedrick v. True, 443 F.3d 342, 359 (4th Cir. 2006) (citing Coleman v. Thompson, 501 U.S. 722, 750 (1991)). The "fundamental miscarriage of justice" exception applies only to a narrow class of cases involving extraordinary instances "where a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense." Dretke v. Haley, 541 U.S. 386, 392-94 (2004) (citing Murray v. Carrier, 477 U.S. 478, 494-96 (1986)).

### III. DISCUSSION

As noted, in his two claims for relief, Petitioner contends that he was denied due process under the Fourteenth Amendment when the prosecutor allegedly made improper arguments to the jury and when the trial court admitted evidence of Petitioner's religious beliefs. Petitioner raised both of these claims on direct appeal in state law terms only, and the North Carolina Court of Appeals consequently adjudicated both claims in terms of state law only. See (Doc. Nos. 5-5 at 9, 16; 5-6). It is well settled that a federal habeas petitioner must raise his claims in terms of an applicable federal right in state court in order to obtain federal habeas review. See Baldwin v. Reese, 541 U.S. 27, 29 (2004) (stating that to satisfy the exhaustion requirement of § 2254, a prisoner must "fairly present" his federal claim in the state courts) (discussing Duncan v. Henry, 513 U.S. 364 (1995)). Petitioner did not raise his claims in terms of violation of a federal right; thus, he has not exhausted these claims. Moreover, if Petitioner were to return to state court and file a post-conviction motion for appropriate relief attempting to raise his two claims in terms of a violation of his federal constitutional rights, the claims would be found to be procedurally barred under North Carolina's mandatory post-conviction procedural bar statute. See N.C. GEN. STAT. § 15A-1419(a)(3) and (b) (2013) (claim shall be denied when defendant was in adequate position to have raised it in prior appeal but did not do so, absent cause and prejudice or fundamental miscarriage of justice, i.e., "actual innocence"); Rose v. Lee, 252 F.3d 676 (4th Cir. 2001) (noting that North Carolina's post-conviction procedural bar statute of § 15A-1419 is now mandatory); Breard v. Pruett, 134 F.3d 615 (4th Cir. 1998) (stating that procedural default occurs when habeas petitioner fails to exhaust available state remedies and court to which petitioner would be required to present his claims in order to meet exhaustion requirement would now find claims procedurally barred).

9

In sum, both of Petitioner's claims are denied because he did not raise them on appeal in terms of federal constitutional violations.[2]

**IV. CONCLUSION**

For the reasons stated herein, Respondent is entitled to summary judgment.

**IT IS, THEREFORE, ORDERED** that:

1. Respondent's Motion for Summary Judgment, (Doc. No. 4), is **GRANTED**, and the petition is dismissed.

2. It is further ordered that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2); Miller–El v. Cockrell, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

Signed: May 23, 2014

Frank D. Whitney
Chief United States District Judge

---

[2] Respondent further contends that Petitioner's claims are without merit. While the Court ultimately agrees with Respondent, whether Petitioner's claims have merit is irrelevant on this Court's habeas review since they are procedurally barred.